December 12, 1860.

---

## SUPREME COURT—IN BANCO.

### JANUARY TERM, 1861.

#### GEORGE DAVIS *vs.* WILLIAM L. GREEN.

A BRAND, of itself, is not conclusive evidence of the ownership of an animal any more than is the fact of an animal being unbranded.

The law regulating the brands and marks of private owners, is not intended to apply to the wild herds roaming on the sides of Maunakea, which are universally recognized as the "mountain cattle of the King and Government."

These cattle cannot be regarded as animals *feræ naturæ*, and therefore do not belong to that class recognized by the law as not being the subject of property in any person until reduced to possession by the captor.

The grantee of those unbranded mountain cattle from the Government, can not be allowed to enter upon the lands of private parties for the purpose of capturing these cattle, without the consent of the owners of such lands; nor can he convert the cattle of private owners because found *unbranded* upon lands leased by him.

The owners of private lands have no right to convert the said unbranded cattle of the King and Government because found upon their lands.

George Davis *v.* William L. Green.

Justice ROBERTSON delivered the judgment of the Court as follows :

This is an action of trover, brought by the plaintiff to recover from the defendant the value of twenty-nine bullock hides, alleged to have been wrongfully taken and converted by certain agents of the defendant, at Waimea, Hawaii. The action was brought up to this Court at the July term, 1860, on appeal from the Police Court of Honolulu, and tried before a jury, who found a verdict for the defendant. Counsel for the plaintiff filed a bill of exceptions to certain rulings of the presiding judge, and to some parts of his charge to the jury, and thereupon moved the Court to grant a new trial. This motion came up for argument at the present term, when it was agreed by the parties that the case should be re-argued before the Court, in Banco, upon the evidence previously adduced, with the addition of such further testimony as either party might be able to produce, so that the merits of the controversy, the real magnitude of which far exceeds the pecuniary measure of the present action, should be fully investigated by the Court, according to whose final judgment on review, the verdict of the jury should either be affirmed or set aside.

The plaintiff is the proprietor of an extensive tract of land, called the Ahupuaa of Waikoloa, on the north-western slope of Maunakea, and running down to Waimea, Island of Hawaii, where he also possesses a large herd of cattle. The Ahupuaa of Waikoloa adjoins, for many miles, the lands upon which run the herds of cattle, usually known as " the wild cattle of the King and Government." The twenty-nine hides, the value of which is sued for in this action, were taken from unbranded animals, said to have been found and captured on the plaintiff's land, and were in his possession, or in that of his servants, when taken away by the defendant's agents.

The defendant sets up a title to the hides in question, as agent for, and on behalf of, Mr. Robert C. Janion, who, it is claimed, is the lessee of the lands of the King and of the Government, upon which the wild unbranded cattle run about Maunakea, and the grantee of the herds of cattle themselves, so that he stands not in the position of a mere wrong-doer. It is therefore necessary that the plaintiff should show something more,

George Davis *v.* William L. Green.

to enable him to recover, than his bare possession. Accordingly he claims the general, or absolute, property in the hides, upon the following grounds, viz : first, that the animals having been captured upon his land, must be presumed, although unbranded, to have been his own cattle ; secondly, that the wild unbranded cattle, on and about Maunakea, are animals feræ naturæ,—not the property of any person, until he has taken them into possession, and may be lawfully captured by any person who finds them upon his own land ; thirdly, that if the animals in question belonged to the herds called " the wild cattle of the King and Government," plaintiff had the right, by custom, to capture them when found upon his own land, and to convert them to his own use.

As a matter of history, it is known to the Court that the first cattle placed upon these Islands were landed at Hawaii, in the years 1793 and 1794, by the British navigator Captain Vancouver, by whom they were intended as a prospective boon. to the inhabitants, and to those who should visit the Islands for purposes of trade or of refreshment. King Kamehameha the First had, at that time, attained the ascendency over the whole Island of Hawaii, and, at the suggestion of Vancouver, he proclaimed a strict taboo, or prohibition, against the killing of the cattle or their offspring, for a period of ten years. This wise precaution secured the accomplishment of the donor's friendly intentions, for before the lapse of many years, the cattle were numbered by thousands, and in course of time the herds overran a large part of the Island.

It is in evidence before us, by the testimony of William Hughes and others, that, about the year 1826, when the late Chief Kuakini (John Adams) was Governor of Hawaii, he employed Hughes to catch and kill cattle out of the roaming herds, for the purpose of obtaining their hides and tallow, as a source of income for the Government, or rather for his late Majesty Kamehameha the Third, no Constitutional Government having been established at that time. The King subsequently engaged the late Joaquin Armas, with a small party of Californians, to prosecute the same business. Hughes estimates the number of cattle captured and killed by himself and his party at forty thousand. In the year 1841, the cattle were again placed under

taboo, all persons being publicly prohibited from capturing or killing them. Mr. J. P. Parker testifies that, up to that time he was the only person who had the privilege of shooting cattle on the mountain; while Mr. Haalelea, who lived with Governor Adams, mentions one or two others, who, he thinks, had a like privilege from the Governor. Dr. Judd testifies that, after the taboo of 1841, no person had the privilege of taking any of the cattle, except some foreigners who pursued the business of sawing timber in the forest, and who were permitted by the Government to take cattle for food. The charge of the cattle on the mountain, after Hughes' time, was given to Mr. William Beckley, and after him to Mr. Isaac Davis, a son of the plaintiff, who acted as agent for the King and Government. In the year 1850, the following petition was presented to the King in Council, by the late James Young Kanehoa, viz :

"HONOLULU, Oahu, April 6, 1850.

" His Majesty KAMEHAMEHA, in Privy Council :

"Sire :—Your Majesty is most probably aware, that on the arrival of Captain Vancouver at these Islands, he presented your illustrious Sire and my father some cattle, from which have propagated the numerous herds of wild cattle that now roam on the mountains of Hawaii. So long as these cattle were appropriated to your Majesty's private use, your petitioner appreciated the manner in which they were disposed of, but as they are now become a portion of public revenue, your petitioner most humbly begs that your Majesty will be graciously pleased to order, that a portion of these cattle may be given me, my brother and sisters, as the heirs of John Young, the faithful companion of your Majesty's father, and as in duty bound your petitioner will ever pray.    J. Y. KANEHOA."

On the 18th of April, 1850, the following resolution was passed, in Council, touching the foregoing petition, viz :

"*Resolved*, That one thousand of the wild cattle of Hawaii be and are hereby given to the heirs of John Young, Senior, for their portion of said cattle ; and that the shepherd of those cattle is hereby authorized to select and deliver to or permit said heirs to take such cattle, whenever it shall please them so to do : *Provided*, however, that said heirs shall take said cattle within two years from this date, without their increase."

On the 10th of June, 1850, the following resolution was passed by the King in Council, viz :

"*Resolved*, That the arrangement hitherto existing between his Majesty and the Government, with regard to the cattle in Waimea, Hawaii, be hereby confirmed so far as the joint ownership of said parties is concerned, and that in future the net proceeds of all said cattle be divided equally between his Majesty and the Government, and that neither party shall sell or remove any of them without the concurrence of the other party ; said cattle furthermore to be left, in charge of an agent to be chosen mutually by the King and the Minister of the Interior for the Government : *Provided always*, that it be understood the cattle running in the joint herd, but belonging to one or the other of the parties exclusively, be not affected by the resolution."

In the General Appropriation Bill of the year 1854–5, the Legislature made an appropriation of two thousand dollars, for the construction of a road from Waimea to Hilo, "to be paid out of the avails of wild cattle," to be sold for that purpose.

On the 8th day of April, 1857, the Minister of the Interior conveyed to Mr. Edward P. Adams, by an instrument in writing, "all and singular the wild cattle, to wit, bulls, oxen, cows and calves, unmarked and unbranded, now running on the Island of Hawaii, in the District of Hilo, Hamakua, and South Kohala, and on or near the mountains of Maunakea and Maunaloa," excepting so many of such cattle as had been previously sold to other parties, and then remained undelivered, "together with the privilege of pursuing, taking, driving and slaughtering the same, wherever they may be found upon lands belonging either to the King or the Government, without charge for pasturage while they pasture on the portions of the lands over which they have heretofore and now range, and with the right of entry upon the said lands, (the King's land of Puukapu excepted,) for and during the term of three years from and after the first of July next."

On the 24th of January, 1858, the Minister of the Interior issued a public notification, which appeared in the Government Gazette, calling upon all parties who had purchased wild cattle of the King and Government, previous to the 1st of January,

1857, to take and remove their cattle before the 1st day of May, 1858, and warning all other persons against taking any of the wild cattle.

On the 16th of November, 1859, the Minister of the Interior, acting on behalf of his Majesty, and of the Government, entered into a written agreement, under seal, by which he leased to Mr. Robert C. Janion, his representatives and assigns, "all that part of those lands belonging to his Majesty and to the Government, on the mountain of Maunakea, lying above the forest, on the Hilo side of the mountain and on the Waimea side of the mountain, above the lands of Paauhau and Waikoloa," (excepting certain lands specified in the instrument,) "with the privilege of catching and killing the wild unbranded cattle thereon, and also the privilege of catching and killing the said wild unbranded cattle on any other lands belonging to His Majesty or to the Government in the districts of Hilo, Hamakua and South Kohala (excepting his Majesty's land of Puukapu,) for and during the term of five years from and after the first day of August, A. D. 1859." The instrument, which is somewhat inartificially drawn, concludes with a covenant on the part of the Minister of the Interior, "that he is duly and fully authorized, and has good right to sell and convey the above named cattle, and all the right, title and interest, either of his Majesty the King, or of the Hawaiian Government, therein or thereto as aforesaid, and also to lease his Majesty's lands included in this agreement."

To this instrument there is appended an additional writing, which reads as follows : " Whereas, it was intended by the party of the first part to the foregoing instrument, dated November 16th, 1859, to give to the party of the second part all such right as his Majesty and the Hawaiian Government may have to catch and kill wild unbranded cattle on the island of Hawaii, for the term of five years from and after the 1st day of August, A. D. 1859 ;

" Now these presents witness that the said party of the first part in said instrument, for the considerations therein mentioned, and for the further sum of one dollar, the receipt whereof is hereby acknowledged, hath given, granted and leased, and by these presents doth give, grant and lease unto

the said Robert C. Janion, his executors, administrators and assigns, all the right, title and interest of his Majesty Kamehameha IV., and also of the Hawaiian Government, in and to all and singular the wild and unbranded cattle, to wit, bulls, oxen, cows and calves, unmarked and unbranded, now running on the island of Hawaii, with all such right as his Majesty and the Hawaiian Government have or may have respectively, to catch, kill and convert the same, for the term of five years from the 1st day of August, A. D. 1859, as aforesaid.

"In witness whereof I have hereunto set my hand and the seal of the Department of the Interior, this 19th day of March, 1860.

"(L. S.)      L. Kamēhameha."

The origin and growth of the different herds of cattle, belonging to private individuals, about Waimea and the slopes of Maunakea, have been fully described in evidence ; and it appears from this evidence that there is a number of what may be termed "wild cattle," or, as some of the witnesses called them, *bush cattle*, which have located themselves in the forest belt of Hamakua. It appears that these cattle have mainly sprung from animals which have strayed from the herds of the late Mr. William French (now Mr. Janion's), Mr. Parker, and Mr. Purdy, whose cattle formerly, if not at present, ran in common, the ranges of pasture land not being divided by fences. But these bush cattle are said to be readily distinguishable from the wild mountain cattle, which differ in appearance from all other cattle upon the island of Hawaii. There is some proof also that there are unbranded cattle running on the plaintiff's land of Waikoloa, that is, animals belonging to his private herd, which have escaped being branded.

As to the first point made by the plaintiff, viz : that the animals from which the hides in question were taken, having been found upon his land, must be presumed, although not branded, to have been his own cattle ; we are of the opinion that such presumption cannot be made, conclusively, in his favor, with any greater propriety than it could be conclusively presumed, on the other hand, that because these cattle were unbranded, they must therefore have been wild mountain cattle, belonging

to Mr. Janion. The question as to whether these cattle belonged to the plaintiff's herd, or to the herds of wild cattle, was properly left to the decision of the jury, as a question of fact, upon all the circumstances of the case as given in evidence; and the jury having found for the defendant, they must have been satisfied that, according to the weight of evidence, the cattle in question were wild mountain cattle. The only ground that appears for presuming that these cattle belonged to the plaintiff, is the fact that they were found upon his land, where there are said to be some unbranded cattle of his which have escaped the drivings of his herdsmen. But the presumption that these were mountain cattle from the wild herds rests upon a broader foundation. While it is the habit of the owners of private herds to brand every animal they possess, so far as their animals can be gleaned for that purpose by stated "drivings in," from the different parts of their ranges, not one of the wild cattle of the King and the Government which run on the mountain are ever branded; for the law which regulates the brands and marks of private owners never was intended to apply to the wild herds which roam on the sides of Maunakea, and which are universally recognized as the "mountain cattle of the King and Government." It is in evidence too that numbers of these cattle are frequently seen on Waikoloa, and many of them have been captured there, from time to time, showing that they are in the habit of frequenting that land. Further, it appears that of the twenty-nine hides in question no fewer than ten or twelve were large bulls' hides, and only seventeen the hides of cows, showing a disproportion between males and females, peculiar to the wild herds, and which does not exist in any herd accustomed to be penned, or to be taken care of by herdsmen. Upon these grounds we think the inference is irresistible that the animals from which the hides were taken were mountain cattle.

But it is contended on the part of the plaintiff that the herds of wild mountain cattle are animals *feræ naturæ*, of a wild nature, which the law does not recognize as the subject of property in any person, until he has reduced them to possession, and that if the cattle from which the hides were taken belonged to these wild herds, he had a right to capture them, as wild animals, and to convert them to his own use when found upon his land.

In our opinion these mountain cattle cannot be legally regarded as animals *feræ naturæ.* They do not belong to a species of animals which are ever classed as wild animals by nature, either by writers on law or on natural history. Nor is their state like that of animals originally *feræ naturæ,* which have for a time been brought under the immediate control and dominion of man, but have escaped and gone back to their naturally wild state. These cattle are the progeny of the tame cattle landed by Vancover, which, in the course of time, have become more wild in their habits and appearance than the cattle which range on the lower lands, from the fact that they have been allowed to range at large, and to propagate their race free from the restraints and the management used in the care of the private herds, many of which, however, can only be reduced to manual possession by the same means that thousands of the mountain cattle have been captured, namely, with a fleet horse and a lasso. The difference between the mountain cattle and the cattle of private owners is not a difference of species or of nature, but merely a difference as to the degree of wildness in habit and appearance, superinduced by various causes, and they can no more be regarded as animals *feræ naturæ* on that account than the cattle of the plaintiff could be so regarded, if he should see fit to let them breed and range on Waikoloa for several generations without bestowing upon them the customary care and management. In that case the plaintiff's cattle, however wild they might become, would still be his property, and could not be captured and converted by neighboring proprietors as wild animals, even when found upon their own lands.

The mountain cattle have been in the constructive possession of the King and Government ever since the original stock were landed by Vancouyer. The evidence is conclusive that the King and Government have continually asserted and maintained their exclusive ownership of these cattle, with the exception of that portion of them which was set apart by the King in Council, in the year 1850, as the private property of the heirs of John Young. The action of the Privy Council upon the petition of James Young Kanehoa shows clearly that at that time the Government did not regard the mountain

cattle as animals *feræ naturæ*, at the disposal of the captor, but as having always been the subject of property, not only in the King or Government, but in private individuals, the heirs of one of the original donees. And it is in evidence, by disinterested witnesses, that, up to within a few years back, when any of the mountain cattle happened to be penned with the cattle of private owners, during a general "drive in," they were treated as the property of the Government, and held at the disposal of its agents.

By way of illustration, suppose that the heirs of John Young had caused their portion of the wild cattle to be caught and branded, and then had allowed them to run at large as before, their nature, habits and appearance unchanged, would the proprietors of private herds in the neighborhood have been permitted, upon finding these cattle on their lands, to take and convert them to their own use, on the pretence that they were animals *feræ naturæ?* We think not. And yet the title of the heirs of John Young in these cattle would not have been any better after the mere act of branding than it was before. But had the cattle been animals *feræ naturæ* before the act of branding, they would not by branding merely have become 'the absolute property of. the heirs of John Young, so as to prevent any person who found them upon his land from killing or capturing them.

In regard to the third point raised by the plaintiff, viz : that if any of the cattle known as the "wild cattle of the King and Government" were found upon his land, he had a right, by custom, or prescription, to capture and convert them to his own use ; we are of the opinion that he is not sustained by the proofs ; but, on the contrary, we think it is clearly established by the weight of evidence that no such customary or prescriptive right exists.

But it is argued further, on the part of the plaintiff, that the deed from the Minister of the Interior to Robert C. Janion is merely a lease of certain lands of the King and Government, with the privilege of capturing and killing any of the wild unbranded cattle found thereon, and does not convey to him any right of property in those cattle as they run at large, nor until he has reduced them to actual possession ; so that he could not

George Davis *v.* William L. Green.

maintain an action of trover for their conversion, and can not defend against this action, not having sufficient right of property to draw after the constructive possession of the cattle. There would seem to be ground for such an argument, upon the agreement of the 16th of November, 1859, considered by itself; but as that instrument has been supplemented by the additional and explanatory writing of the 19th of March, 1860, the two documents must be taken and considered as one conveyance, and do, in our opinion, clearly amount not only to a lease of the lands therein demised, but also to a conveyance of all the right, title and interest of the King and Government, in the wild unbranded cattle on the Island of Hawaii, to Robert C. Janion and his representatives, for a specified term, upon certain conditions, so that the entire property in those cattle, (except the contingent right of reversion in such as may be left at the expiration of his term,) is in the grantee at the present time, and will remain in him until his rights are determined by the lapse of time, or breach of condition, and he may, unquestionably, maintain any action necessary to defend those rights, the same as if he had received a conveyance of the cattle forever.

Finally, it is contended by the plaintiff that the defendant, by producing the deed from the Minister of the Interior to E. P. Adams, has shown the property in the cattle to have been in Mr. Adams, and not in Mr. Janion, at the time this action was commenced, inasmuch as he has not proven that Mr. Adams' grant had at that time been determined, either by lapse of its term, or by relinquishment, or that it had been assigned to Mr. Janion. This point was made for the first time at the hearing in banco, and was therefore not passed upon by the jury. While it is true that the defendant has not expressly proven the extinguishment of Mr. Adams' rights, there is, in our opinion, evidence in the case sufficiently strong to warrant the inference by the Court, that the grant to Mr. Adams had been surrendered, or otherwise determined, before Mr. Janion obtained his grant. It is clear that Mr. Janion, through his agents, had been exercising, publicly and without dispute, all the rights of ownership over the mountain cattle on his leased lands, for a considerable time before the cause of this action occurred; while

the plaintiff has proved nothing to support his action, beyond the bare possession of the hides, and that a possession without right.

Counsel for the plaintiff urged upon the Court the exposure to damage of the plaintiff, and others, who own private herds, if Mr. Janion's agents are permitted to enter upon their lands, for the purpose of pursuing and capturing these wild cattle ; and we wish it therefore to be distinctly understood that while we hold that neither the plaintiff, nor others, have a right to take and convert those cattle, because found upon their lands, Mr. Janion or his agents have no right to enter upon those lands, for the purpose of capturing cattle under his grant from the King and Government, without the consent of the owners of the lands, nor to take and convert the cattle of private owners, because found *unbranded* upon the lands leased by him. A brand, of itself, is not conclusive evidence of the ownership of an animal, any more than is the fact of an animal being unbranded.

Our decision is that the virdict of the jury stand affirmed. Let judgment be entered accordingly, with costs.

Mr. Harris, for the plaintiff.

Mr. Montgomery and Mr. Bates, for the defendant.